UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VAUGHN COOPER, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF VANEISHA COOPER, DECEASED, VIVIAN HARGROVE, INDIVIDUALLY, AND AS NEXT FRIEND OF J.A.C., A MINOR, YVETTE YVONNE ROBERTS, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF RILEY WESLEY SHARBER, DECEASED, EMMA JEAN NELSON AS NEXT FRIEND OF E.Y.S., A MINOR, AND THERESA COLLIER, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF BRIANA COLLETTE JACKSON, DECEASED | § | Case No. 1:10-cv-06152 |
| Plaintiffs | § | |
| V. | § | |
| BRIDGESTONE AMERICAN TIRE OPERATIONS, LLC and BRIDGESTONE AMERICAS, INC. | § | |
| Defendants | § | JURY DEMANDED |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE COURT:

COME NOW, Vaughn Cooper, Individually, and as Representative of the Estate of Vaneisha Cooper, Deceased, Vivian Hargrove, Individually, and as Next Friend of J.A.C., a Minor, Yvette Yvonne Roberts, Individually, and as Representative of the Estate of Riley Wesley Sharber, Deceased, Emma Jean Nelson as Next Friend of E.Y.S., a Minor, and Theresa Collier, Individually, and as Representative of the Estate of Briana Collette Jackson, Deceased, Plaintiffs herein, and files their Complaint naming as Defendants Bridgestone Americas Tire Operations, LLC, Bridgestone/Firestone, Inc.,

Bridgestone/Firestone North American Tire, LLC, Bridgestone Americas Holding, Inc., and Bridgestone Americas, Inc., and for their cause of action would show as follows:

## I. JURISDICTION AND VENUE

1.1  The Court has jurisdiction over this cause of action because this is a cause of action between Plaintiffs, citizens of Ohio, Minnesota and Texas, and foreign defendants created and existing under the laws of Nevada which maintain their principal place of business in Tennessee, and the amount in controversy for each Plaintiff exceeds $75,000.00, exclusive of interest and costs. 28 U.S.C. § 1332(a)(2).

1.2  This civil action is founded upon diversity of citizenship.

1.3  Venue is proper in the Northern District of Illinois, Eastern Division, under 28 USC § 1391 because Defendants are deemed to reside in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a)(1), (c), a substantial part of the events or omissions giving rise to the claim occurred in Cook County, Illinois and the Defendants are subject to personal jurisdiction in Cook County, Illinois at the time the action is commenced.

1.4  Defendants have previously appeared in and defended one or more lawsuits in Illinois containing allegations that tires manufactured by Defendants were defective and caused personal injury and death.

1.5  Defendants' contacts with the State of Illinois are continuous and systematic, such that the Court has general personal jurisdiction over the Defendants.

1.6  Tires manufactured by Defendants are routinely sold in Illinois through local and national dealerships doing business in the State of Illinois.

1.7  Defendants purposefully market and sell their tires through distributors and stores in Illinois.

1.8 Accordingly, Defendants have purposefully availed themselves of the privileges and benefits of conducting business in Illinois.

1.9 Defendants are aliens and thus may be sued in any judicial district pursuant to 28 U.S.C. §1391 (d).

## II. PLAINTIFFS

2.1 Plaintiff Vaughn Cooper is an individual and a citizen of Ohio.

2.2 Vaughn Cooper is the natural and biological father of Vaneisha Cooper, Deceased.

2.3 At the time of her death, Vaneisha Cooper, a citizen of Ohio, had one minor child, J.A.C. She had no debts of her own, no will, and no assets beyond the causes of action, which her estate is now bringing this civil action.

2.4 No administration is necessary for Vaneisha Copper's estate.

2.5 Vaneisha Cooper's heirs are her natural father and mother, Vaughn Cooper and Vivian Hargrove, and her natural son J.A.C.

2.6 Vaneisha Cooper's father Vaughn Cooper is acting as the personal representative of her estate.

2.7 Vivian Hargrove is an individual and a citizen of Ohio.

2.8 Vivian Hargrove is the natural and biological mother of Vaneisha Cooper, Deceased. Vivian Hargrove is the guardian of J.A.C., a minor. Vivian Hargrove brings suit individually and as next friend of J.A.C.

2.9 J.A.C. is the only child born to decedent Vaneisha Cooper. J.A.C is an individual and a citizen of Ohio.

2.10 Yvette Yvonne Roberts is an individual and a citizen of Ohio.

2.11 Yvette Roberts is the natural and biological mother of Riley Wesley Sharber, Deceased.

2.12 At the time of his death, Riley Sharber, a citizen of Ohio, had one minor child, E.Y.S. He had no debts of his own, no will, and no assets beyond the causes of action, which his estate is now bringing this civil action.

2.13 No administration is necessary for Riley Sharber's estate.

2.14 Riley Sharber's heirs are his natural mother, Yvette Yvonne Roberts, his natural daughter E.Y.S., and his natural father Riley Coley.

2.15 Riley Sharber's mother Yvette Yvonne Roberts is acting as the personal representative of his estate.

2.16 Emma Jean Nelson is an individual and a citizen of Texas.

2.17 Emma Jean Nelson is the natural and biological mother of E.Y.S., a minor. Emma Jean Nelson brings this suit as next friend of E.Y.S. who sustained serious and permanent injuries in the incident and as witnessed the fatal and traumatic injuries of her father Riley Sharber, Deceased.

2.18 E.Y.S is the only child born to decedent Riley Sharber. E.Y.S. is an individual and a citizen of Texas.

2.19 Plaintiff Theresa Collier is an individual and a citizen of Minnesota.

2.20 Theresa Collier is the natural and biological mother of Briana Collette Jackson, Deceased.

2.21 At the time of her death, Briana Collette Jackson, a citizen of Minnesota, had no children, no debts of her own, no will, and no assets beyond the causes of action which her estate is now bringing this civil action.

2.22 No administration is necessary for Briana Collette Jackson's estate.

2.23     Briana Collette Jackson's heirs are her natural mother Theresa Collier and natural father Kevin Leroy Jackson.

2.24     Briana Collette Jackson's mother Theresa Collier is acting as the personal representative of her estate.

### III.  DEFENDANTS

3.1     Defendant Bridgestone Americas Tire Operation, LLC, formerly known as Bridgestone/Firestone North American Tire, LLC, successor to Bridgestone/Firestone, Inc., and Bridgestone Americas, Inc., formerly known as Bridgestone Americas Holding, Inc., hereinafter referred to collectively as "Bridgestone/Firestone" is a Delaware Corporation with its principal place of business of Tennessee.  Defendant Bridgestone Americas Tire Operation, LLC may be served with process by serving its registered agent for service of process, National Registered Agents, Inc., 200 West Adams Street, Chicago, Illinois, 60606.

3.2     Defendant Bridgestone Americas, Inc. hereinafter referred to collectively as "Bridgestone/Firestone" is the successor to Bridgestone/Firestone, Inc. and/or Bridgestone/Firestone North American Tire, LLC, and/or Bridgestone Americas Holding, Inc. and/or Bridgestone Americas, Inc. merged with and/or acquired the liabilities of Bridgestone/Firestone, Inc. and/or Bridgestone/Firestone North American Tire, LLC, and/or Bridgestone/Firestone, Inc. and/or Bridgestone/Firestone North American Tire, LLC and/or Bridgestone Americas Holding, Inc. changed its name to Bridgestone Americas, Inc., and/or Bridgestone Americas, Inc. is formerly known as Bridgestone/Firestone, Inc. and/or Bridgestone/Firestone North American Tire, LLC. Bridgestone Americas Inc. is a Nevada Corporation with its principal place of business in Tennessee.  Defendant Bridgestone Americas, Inc. may be served with process by

serving its registered agent for service of process, National Registered Agents, Inc., 200 West Adams Street, Chicago, Illinois, 60606.

### IV. FACTS AND CLAIMS

4.1     On August 15, 2009, Vaneisha Cooper was driving a 1996 Lincoln Towncar northbound on I-65 in Jasper County, Indiana.

4.2     Traveling with her were Riley Sharber, right front passenger, Briana Jackson, back left passenger, and E.Y.S., back right passenger. All occupants of the vehicle were properly wearing their lap and shoulder safety belts.

4.3     As the Towncar was traveling within the speed limit along the flat dry pavement, the tread suddenly and unexpectedly separated from the vehicle's right rear tire causing the vehicle to lose control and cross the center median into oncoming traffic. The Towncar was then struck by a tractor-trailer traveling in the southbound lanes of I-65.

4.4     As a result of the collision, Vaneisha Cooper and Riley Sharber received fatal injuries and died at the scene of the incident.

4.5     Briana Jackson received severe and permanent injuries that eventually took her life on August 24, 2009 after she received emergency care for nine days at Advocate Christ Hospital and Medical Center in Oak Lawn, Cook County, Illinois.

4.6     E.Y.S. was also transported to Advocate Christ Medical Center where she remained for twenty-seven days as she was closely monitored due to the significant head injury she received in the incident. When she eventually reached a level of medical stability where she could travel, Emyla was transferred to Gillette Children's Specialty Healthcare in Minnesota to continue treatment. On December 4, 2009 she was released into her mother's care.

4.7     E.Y.S. is the only survivor of this incident and she witnessed the death of her father Riley Sharber.

4.8     The subject tire that failed is a Bridgestone Insignia SL 215/70R15, bearing DOT #1CM3 PNI 4001, manufactured in the 40th week of 2001 at Defendants' Oklahoma City plant.

4.9     In the decade before the subject tire was made, Defendants undertook to investigate the efficiency of the antidegradants and antioxidants in its belt rubbers.

4.10    In 2005, Defendants undertook to warn that tires then years past their manufacture date should be removed from service.

4.11    A true and correct copy of Defendants' Service Bulletin entitled "Tire Inspection Guidelines" is attached as Exhibit A to this Complaint.

4.12    When Defendants undertook to warn that Defendants' tires ten years past their manufacture date should be removed from service but Defendants' tires less than ten years past their manufacture date need not be removed from service, Defendants understood that is warning would be relied upon by the general public.

4.13    Some other tire manufactures warn that tires should be removed from service before they are beyond six years past their manufacture date.

4.14    Some vehicle manufactures warn that tires should be removed from service before they are beyond six years past their manufacture date.

4.15    Reasonably careful tire companies seek to warn that their tires should be removed from service before their antidegradant and antioxidant components of their belt rubbers cease to provide effective protection against degradation and oxidation.

4.16 Reasonably careful tire companies seek to design their tires so that the antidegradant and antioxidant components of their belt rubbers remain effective during the time period while it is foreseeable that the tires will remain in service.

4.17 Reasonably careful tire companies seek to manufacture their tires so that the antidegradant and antioxidant components of their belt rubbers remain effective during the time period while it is foreseeable that the tires will remain in service.

4.18 The Bridgestone Insignia SL tire was researched, developed, designed, manufactured, inspected, tested, sold, evaluated in the field, warned about, and warranted by Defendants.

4.19 When the Bridgestone Insignia SL tire was designed, manufactured, marketed and sold, Defendants were in the business of designing, manufacturing, and selling tires such as the Bridgestone Insignia SL.

4.20 The failed Bridgestone Insignia SL was defectively designed, defectively manufactured, and defectively marketed in a grossly negligent and malicious manner, and it was in an unreasonably dangerous and unfit condition at the time it left the control of Defendants.

4.21 There was substantially more than 2/32 of an inch of tread depth remaining on the Bridgestone Insignia SL when the tread and top belt separated from the bottom belt and carcass.

4.22 Reasonably careful tire companies seek to design tires so that the tread wears to 2/32 of an inch before it fails by separation of the tread and top belt from the bottom belt and carcass.

4.23 Reasonably careful tire companies seek to manufacture tires so that the tread wears to 2/32 of an inch before it fails by separation of the tread and top belt from the bottom belt and carcass.

4.24 The Bridgestone Insignia SL failed during its useful tread life as a result of a separation of the tread and upper belt from the lower belt and carcass.

4.25 The premature failure of the Bridgestone Insignia SL as a result of a separation of the tread and upper belt from the lower belt and carcass was a result of manufacturing and design defects and maliciously and grossly negligent manufacturing and design practices.

4.26 Aside from foreseeable wear and aging, the Bridgestone Insignia SL was in the same condition at the time of the crash as it was when it left Defendants' possession.

4.27 The defective, unfit and unreasonably dangerous conditions of the Bridgestone Insignia SL were a producing and proximate cause of the crash made the basis of this civil action, the fatal injuries and the severe injuries and damages sustained by the Plaintiffs.

4.28 Technologically and economically feasible safer alternative designs existed that would have prevented or significantly reduced the risk of injury and death without substantially impairing the tire's utility.

4.29 The safer alternative designs include, but are not limited to, the use of proper rubber antidegradants including a proper antioxidant package in the belt rubber, the use of belt edge rubber strips or wedges or insulation or wraps at the belt edges, the use of nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies, the use of slower tire curing at lower

temperatures, the use of proper innerliners with sufficient lapped splicing and sufficient rubber gauge and sufficient amounts of halobutyl rubber to guard against the permeation of air into the tire, and the use of other tire aging and separation countermeasures.

4.30 Defendants make tires for sale in the domestic market in the United States and also make tires for sale in foreign markets outside of the United States.

4.31 Defendants are aware of tire design practices employed by other tire manufacturers with plants in the United Stated.

4.32 Defendants are aware of tire design practices employed by other tire manufacturers with plants in the United States as a result of Defendants' reverse engineering of other tire manufacturers' tires.

4.33 Defendants are aware of tire design practices employed by other tire manufacturers with plants in the United States as a result of Defendants' access to Smithers' reports on other tire manufacturers' tires.

4.34 Defendants designed and made the Defendants Bridgestone Insignia SL without using the most robust combination of antidegradants and antioxidants Defendants had available.

4.35 When Defendants made the Defendants Bridgestone Insignia SL, Defendants were making other tires with more robust antidegradants and antioxidants.

4.36 Defendants do not use the most robust combination of antidegradants and antioxidants Defendants have available in the design or manufacture of the majority of its passenger car tires.

4.37 When Defendants made the Bridgestone Insignia SL, the percentage of passenger car tires Defendants were selling in the domestic market in the United States

with the most robust combination of antidegradants and antioxidants Defendants had available was smaller than the percentage of tires Defendants was selling in foreign markets outside the United States with the most robust combination of antidegradants and antioxidants Defendants had available.

4.38 Other tire manufacturers with plants in the United States use a more robust combination of antidegradants and antioxidants in the design and manufacture of the majority of their passenger car tires.

4.39 When Defendants made the Bridgestone Insignia SL, Defendants were aware that other tire manufacturers with plants in the United States used a more robust combination of antidegradants and antioxidants in the design and manufacture of their passenger car tires.

4.40 Using a more robust combination of antidegradants and antioxidants is a proven design feature that increases a tire's ability to resist tread separations.

4.41 When Defendants designed and made the Bridgestone Insignia SL without the most robust combination of antidegradants and antioxidants Defendants had available, Defendants were aware that using a more robust combination of antidegradants and antioxidants was a proven design feature that increases a tire's ability to resist tread separations.

4.42 Defendants designed and made the Bridgestone Insignia SL without the use of belt edge rubber strips or wedges or insulation or wraps at the belt edges.

4.43 When Defendants made the Bridgestone Insignia SL, Defendants were making other tires with the use of belt edge rubber strips or wedges or insulation or wraps at the belt edges.

4.44    Defendants do not use belt edge rubber strips or wedges or insulation or wraps at the belt edges in the design or manufacture of the majority of its passenger car tires.

4.45    Other tire manufacturers with plants in the United States use belt edge rubber strips or wedges or insulation or wraps at the belt edges in the design and manufacture of the majority of their passenger car tires.

4.46    When Defendants made the Bridgestone Insignia SL, Defendants were aware that other tire manufacturers with plants in the United States used belt edge rubber strips or wedges or insulation or wraps at the belt edges in the design and manufacture of the majority of their passenger car tires.

4.47    The use of belt edge rubber strips or wedges or insulation or wraps at the belt edges is a proven design feature that increases a tire's ability to resist tread separations.

4.48    When Defendants designed and made the Bridgestone Insignia SL without the use of belt edge rubber strips or wedges or insulation or wraps at the belt edges, Defendants was aware that the use of belt edge rubber strips or wedges or insulation or wraps at the belt edges was a proven design feature that increases a tire's ability to resist tread separations.

4.49    Defendants designed and made the Bridgestone Insignia SL without nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies.

4.50    When Defendants made the Bridgestone Insignia SL, Defendants were making other tires with nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies.

4.51   Defendants do not use nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies in the design or manufacture of the majority of its passenger car tires.

4.52   Other tire manufacturers with plants in the United States use nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies in the design and manufacture of the majority of their passenger car tires.

4.53   When Defendants made the Bridgestone Insignia SL, Defendants were aware that other tire manufacturers with plants in the United States used nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies in the design and manufacture of the majority of their passenger car tires.

4.54   Nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies is a proven design feature that increases a tire's ability to resist tread separations.

4.55   When Defendants designed and made the Bridgestone Insignia SL without nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies, Defendants were aware that nylon or Kevlar belt reinforcements of the belt package whether used in strips or caps or belts or full-belt-width plies is a proven design feature that increases a tire's ability to resist tread separations.

4.56   Defendants made the Bridgestone Insignia SL with a faster cure at a higher curing temperature as compared to other tires Defendants have made.

4.57     When Defendants made the Bridgestone Insignia SL, Defendants was making other tires with a slower cure at a lower curing temperature.

4.58     Other tire manufacturers with plants in the United States made tires using slower cures at lower curing temperatures in the manufacture of a majority of their passenger car tires.

4.59     When Defendants made the Bridgestone Insignia SL with a faster cure at a higher temperature, Defendants was aware that other tire manufacturers with plants in the United States made tires using slower cures at lower curing temperatures in the manufacture of a majority of their passenger car tires.

4.60     Making tires using slower cures at lower curing temperatures is a proven manufacturing process that increases a tire's ability to resist tread separations.

4.61     When Defendants designed and made the Bridgestone Insignia SL with a faster cure at a higher curing temperature, Defendants were aware that making tires using slower cures at lower curing temperatures was a proven manufacturing process that increases a tire's ability to resist tread separations.

4.62     Defendants designed and made the Bridgestone Insignia SL with an innerliner of a thinner gauge or with a lower percentage of halobutyl rubber (or both) as compared other tire Defendants made.

4.63     When Defendants made the Bridgestone Insignia SL, Defendants were making other tires with an innerliner of a thicker gauge or with a high percentage of halobutyl rubber (or both).

4.64     Other tire manufacturers with plants in the United States use innerliners of a thicker gauge or of a higher percentage of halobutyl rubber (or both) as compared

to the Bridgestone Insignia SL in the design and manufacture of the majority of their passenger car tires.

4.65  When Defendants made the Defendants Bridgestone Insignia SL, Defendants were aware that other tire manufacturers with plants in the United States used innerliners of a thicker gauge or of a higher percentage of halobutyl rubber (or both) as compared to the Bridgestone Insignia SL in the design and manufacture of the majority of their passenger car tires.

4.66  The use of innerliners of a thicker gauge or a higher percentage of halobutyl rubber (or both) as compared to the Bridgestone Insignia SL is a proven design feature that increases a tire's ability to resist tread separations.

4.67  When Defendants designed and made the Bridgestone Insignia SL with the innerliner it used, Defendants was aware that use of innerliners of a thicker gauge or a higher percentage of halobutyl rubber (or both) as compared to the Bridgestone Insignia SL is a proven design feature that increases a tire's ability to resist tread separations.

4.68  Defendants have possession of documents, testimony, and information that confirm Defendants made the Bridgestone Insignia SL despite knowledge that its tires would achieve improved durability with respect to the tires' susceptibility to belt and tread separations with the addition of a strip of rubber at the belt edges.

4.69  Defendants has possession of documents, testimony, and information that confirm Defendants mad the Bridgestone Insignia SL despite knowledge that its tires would achieve improved durability with respect to the tires' susceptibility to belt and tread separations with the addition of a nylon reinforcement of the belt package.

4.70   Defendants has possession of documents, testimony, and information that confirm Defendants made the Bridgestone Insignia SL despite knowledge of other tire companies' alternative tire designs by virtue of reverse engineering those tires and comparing their designs with Defendants' designs.

4.71   Defendants have possession of documents, testimony, and information that confirm Defendants made the Bridgestone Insignia SL despite knowledge of the means of improving its tires' resistance to belt and tread separations as a result of its technical correspondence regarding radial passenger tires and improved separation resistance.

4.72   Defendants has possession of documents, testimony, and information that confirm Defendants made the Bridgestone Insignia SL despite knowledge of the causes of belt and tread separations and how to mitigate them as a result of position papers on nylon overlays.

4.73   One reason for the safety standard regulations regarding tires are inadequate has been Defendants' lack of candor in connection with the government's determination of the adequacy of tire regulations.

## V.  PLAINTIFFS' DAMAGES

5.1   As a producing, direct and proximate result of the accident, injuries, and death for which Defendants are liable, Plaintiffs seek and are entitled to the following damages:

    a.   *Personal Injury Damages*

        1. physical pain and mental anguish in the past and future;

        2. loss of earning capacity in the past and future;

        3. loss of wages and earnings in the past and future;

    4. disfigurement in the past and future;

    5. physical impairment in the past and future;

    6. medical care in the past and future;

    7. bystander mental anguish in the past and future; and

    8. all other damages allowed by law and equity.

  b. *Wrongful Death Damages*

    1. pecuniary loss in the past and future;

    2. loss of consortium, companionship and society in the past and future;

    3. mental anguish in the past and future;

    4. loss of inheritance;

    5. loss of community estate and addition to estate;

    6. all other damages allowed by law and equity.

  c. *Survival Damages*

    1. pain and mental anguish;

    2. medical expenses;

    3. funeral and burial expenses; and

    4. all other damages allowed by law and equity.

The damages sought are greatly in excess of the minimum jurisdictional limits of the court. Each of the Plaintiffs' claims separately exceed the jurisdictional minimum of $75,000, exclusive of interest and costs.

## VI. PRE-JUDGMENT AND POST-JUDGMENT INTEREST

6.1    Plaintiffs seek pre-judgment and post-judgment interest as allowed by law.

## VII. JURY DEMAND

7.1 Plaintiffs timely request a trial by jury and have tendered the appropriate fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this cause be set for trial before a jury, and that Plaintiffs recover judgment of and from Defendants for actual and exemplary damages in such amount as the evidence may show and the jury may determine to be proper, together with prejudgment interest, post-judgment interest, costs of court, and such other and further relief to which they may show themselves to be justly entitled.

By: /s/ Craig M. Sico
Craig M. Sico
Illinois Federal Bar I.D. No. 90785913
Texas State Bar I.D. No. 18339850
Texas Federal I.D. No. 13540
SICO, WHITE, HOELSCHER & BRAUGH, L.L.P
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Phone: (361) 653-3300
Fax: (361) 653-3333

**ATTORNEY-IN-CHARGE
FOR THE PLAINTIFFS**

OF COUNSEL:

David E. Harris
Texas State Bar No. 24049273
Texas Federal I.D. No. 712461
SICO, WHITE, HOELSCHER & BRAUGH, L.L.P.
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Phone: 361/653-3300
Fax: 361/653-3333

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, certify that the above and foregoing was electronically filed and service was accomplished pursuant to the ECF for filing users on this the 3rd day of November, 2010.

Respectfully submitted,

By: /s/ Craig M. Sico